IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

GUS VAKAS and GEORGE VAKAS,      )
                                 )
                Plaintiffs,      )     **CIVIL ACTION**
                                 )
v.                               )     No. 05-1317-MLB
                                 )
TRANSAMERICA OCCIDENTAL LIFE     )
INSURANCE CO.,                   )
                                 )
                Defendant.       )
_____)


<u>**MEMORANDUM AND ORDER**</u>

Before the court are plaintiffs' motion for summary judgment (Doc. 17.), defendant's motion for summary judgment (Doc. 25), and plaintiffs' motion to strike (Doc. 30). The motions have been fully briefed and are ripe for decision. (Docs. 24, 26, 28, 29, 31.) Plaintiffs' motion for summary judgment is DENIED, defendant's motion for summary judgment is GRANTED, and plaintiffs' motion to strike is DENIED in part and GRANTED in part, for the reasons stated herein.

This case arises from a dispute over a life insurance policy. Plaintiffs Gus Vakas and George Vakas, both Kansas residents, allege they are entitled to $323,000 as beneficiaries of a life insurance policy taken on the life of their brother, John Louis Vakas, M.D. (Dr. Vakas). Defendant Transamerica Occidental Life Insurance Company, an Iowa corporation, responds that the life insurance policy lapsed prior to the death of Dr. Vakas. Defendant further responds that plaintiffs' claim is barred by the release in a settlement of a class action claim, of which the policy at issue was included. Jurisdiction in this court arises under 28 U.S.C. § 1332.

## I.  FACTS

The following facts are uncontroverted.  Life insurance policy No. 93016561 was issued to Dr. Vakas by Transamerica Assurance Company, the corporate predecessor of defendant, in 1984.  Dr. Vakas designated his mother, Thelma Vakas, the beneficiary of the policy if she was living, but otherwise plaintiffs were designated one-half beneficiaries.  Thelma Vakas died on November 3, 1994.  Dr. Vakas died on March 13, 2005.

Dr. Vakas paid a premium in the amount of $41,374.89 for the policy.  When Dr. Vakas made his initial premium payment, defendant deducted a premium expense charge and the remaining net premium was deposited into the policy's gross value.  The gross value accrued interest daily and the interest earned was deposited into the gross value on each anniversary date of the policy.  On a monthly basis, defendant withdrew a monthly deduction from the gross value to pay the cost of insurance for the preceding thirty days, but only so long as there was gross value, net of policy loans, sufficient to cover the monthly deduction due.[1]

The policy stated that coverage may expire if "no premiums are

---

[1]  Plaintiffs' reply asserts that the facts in this paragraph are controverted.  Plaintiffs claim that because these facts are based on a noncompliant affidavit, the facts are not supported and therefore must fail.  The affidavit is by John Cox, a senior customer services representative for defendant.

Plaintiffs argument is fully addressed below.  Because the court finds the affidavit to be fully compliant with Federal Rule of Civil Procedure 56(e), and because this is the only basis for plaintiffs dispute with defendant's facts, the court deems these facts uncontroverted and discusses them here.  Further, the facts in this paragraph are supported by the policy, which plaintiffs have themselves introduced as an exhibit to their motion for summary judgment.

paid after the initial premium or if subsequent premiums are insufficient to continue coverage." The policy defined the following terms: "Cash Value" as "the gross value as described in the Guaranteed Values section, less any surrender charges"; "Lapse" as "termination of the policy due to insufficient premium or gross value"; "Loan" as "indebtedness to us for loans secured by the policy"; "Loan Value" as "the maximum amount which may be borrowed under the loan provisions"; and "Net Cash Value" as "the Cash Value of this policy less any loans." "Gross Value" is defined as "the sum of all net premiums less any refunds, plus all accrued interest, less the sum of all accrued monthly deductions and a pro rata portion of the monthly deductions to that date, less any partial surrenders."

The policy specified that the cash value of the policy could be "borrowed, used to provide Paid-up insurance, applied under Continuation of Insurance, or taken in cash as a partial or full surrender of this policy." On January 28, 1987, Dr. Vakas requested a $20,000 policy loan on a "Policy Loan Agreement" form, in exchange for an assignment of the policy to defendant for security for the loan. A policy loan provision stated that the loan would be secured by "that portion of the gross value equal to the amount of any loan." Defendant authorized the $20,000 policy loan on February 2, 1987. In a "Policy Loan Statement" dated February 9, 1987, defendant informed Dr. Vakas that policy loans reduce the value of the benefits of insurance and to restore full benefits, "it is important to repay the loan as soon as you can."

Another policy provision relating to loans states that "[s]ubject to the non-forfeiture provision, failure to repay the loan will not

terminate this policy." The non-forfeiture provision provides that "If no option is selected [for the use of cash values], Option 1 - Continuation of Insurance - will apply automatically." The "Continuation of Insurance" option is subject to the "Grace Period" provision. The "Grace Period" provision states: "When the gross value is less than the monthly deduction due . . . we will notify the Owner. A premium providing enough gross value to cover the balance of the deduction must be received within a grace period . . . . If this premium is not received within the grace period, this policy will lapse."

Dr. Vakas requested a second policy loan of $9,900 on September 10, 1987. Defendant authorized the second policy loan on September 15, 1987.[2] Dr. Vakas did not repay the principal or interest on either loan. On June 27, 1995, defendant notified Dr. Vakas that the gross value of his life insurance policy "may not be sufficient to maintain coverage under this contract for another year if no further premiums are paid." In December 1996, defendant notified Dr. Vakas that the life insurance policy had lapsed because the gross value of the policy was no longer sufficient to cover the cost of insurance.[3]

---

[2] The facts regarding the second policy loan made to Dr. Vakas by defendant are not addressed by plaintiffs in any manner. They are therefore deemed uncontroverted. D. Kan. R. 56.1 ("All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.").

[3] Plaintiffs contest this fact solely because it is based on a document provided to them in defendant's Rule 26 disclosures. Rule 56(c) authorizes summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

**II.  CHALLENGE TO THE ORIGINAL COX AFFIDAVIT AND MOTION TO STRIKE THE SUPPLEMENTAL COX AFFIDAVIT**

A.  CHALLENGE TO THE ORIGINAL COX AFFIDAVIT

Plaintiffs filed for summary judgment on May 16, 2006; defendant filed its motion for summary judgment June 23, 2006.  When briefing these motions, plaintiffs filed a combined reply and response because they assert defendant's filings all "present the same exhibits, the same facts, and the same arguments."  (Doc. 28, hereinafter called plaintiffs' combined reply and response.)

Attached both to defendant's response and to defendant's motion for summary judgment is the affidavit of John Cox, a senior customer service representative for defendant.  Plaintiffs' combined reply and response asserts the Cox affidavit does not comply with the requirements of Federal Rule of Civil Procedure 56(e) because it is not based on Cox's personal knowledge of facts which would be admissible in evidence.  Plaintiffs conclude that because the affidavit does not meet Rule 56(e)'s requirements, any facts based upon the affidavit must fail.

Rule 56(e) states, in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Regarding Rule 56(e), the Tenth Circuit has stated that "under the personal knowledge standard, an affidavit is inadmissable

---

Plaintiffs argument is disingenuous.  Plaintiffs are not arguing the content of the facts at issue.  The fact that defendant produced this letter in a forthright manner to plaintiffs in their initial disclosures is an insufficient basis for a challenge.

if the witness could not have actually perceived or observed that which he testifies to." <u>Argo v. Blue Cross and Blue Shield of Kansas, Inc.</u>, 452 F.3d 1193, 1200 (10th Cir. 2006) (internal quotations and citations omitted); <u>but see</u> <u>Told v. Tig Premier Ins. Co.</u>, 149 Fed. Appx. 722, 725 (10th Cir. 2005) ("Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge.").

The Cox affidavit is compliant with Rule 56(e).  Cox states the following: 1) he has been employed by defendant's customer service department since 1997; 2) he is now the senior customer service representative; 3) he reviewed the relevant documents and 4) he is familiar with the terms and conditions of Dr. Vakas' policy.  The factual statements Cox makes in his affidavit are not made upon flimsy "beliefs" or "feelings," but are statements about the records maintained by defendant and the facts those records put forth. Further, contrary to plaintiffs' belief, the Cox affidavit does not make legal conclusions.  Rather, the affidavit puts forth statements of the way defendant handled Dr. Vakas' life insurance policy, from an internal point of view, based on Cox's review of the records.

B.  MOTION TO STRIKE THE SUPPLEMENTAL COX AFFIDAVIT

Defendant's reply to plaintiffs' combined reply and response reacted to plaintiffs' concerns regarding the Cox affidavit by submitting a "supplemental affidavit of John Cox."[4]  The supplemental

---

[4]  Defendant's reply also attached the National Association of Insurance Commissioners Model Laws, Regulations and Guidelines Model 585, which discusses and defines terms regarding universal life insurance.  Plaintiffs do not challenge this attachment in their

affidavit elaborated on Cox's employment with defendant, including a detailed listing of Cox's duties in his capacity as a senior customer service representative.  The supplemental affidavit also expanded on Cox's familiarity with defendant's policies and procedures for maintaining client records.  In addition, the supplemental affidavit supplies new information, specifically in regard to the death benefit that defendant would have applied to Dr. Vakas' life insurance policy if it had considered it a "paid-up life non-forfeiture" policy.  Responding to defendant's supplemental affidavit, plaintiffs filed a motion to strike both the supplemental affidavit and the portions of the reply referencing it.  Plaintiffs assert defendant's response violates the local rules of this court.

Local Rule 56.1(c) states: "In a reply brief, the moving party shall respond to the non-moving party's statement of undisputed material facts in the manner prescribed in subsection (b)(1)." Subsection (b)(1) states:

> A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists.  Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and if applicable, shall state the number of movant's fact that is disputed.

---

motion to strike, and therefore the compliance by defendant with the Federal Rules of Civil Procedure regarding the attachment of this exhibit is not now considered.  See Taylor v. Principi, 141 Fed. Appx. 705, 708 (10th Cir. 2005) (quoting Noblett v. Gen. Elec. Credit Corp., 400 F.2d 442, 445 (10th Cir. 1968) ("An affidavit that does not measure up to the standards of Rule 56(e) is subject to a motion to strike; and formal defects are waived in the absence of a motion or other objection.").

Plaintiffs argue that Rule 56.1 allows a party filing a reply to respond to facts presented by the adverse party but does not allow setting forth additional facts. Plaintiffs assert the amended affidavit sets forth additional, "materially different" facts and therefore violates the local rule. Defendant responds that the affidavit attached to its reply is a supplemental affidavit, permitted by Federal Rule of Civil Procedure 56(e).

Rule 56(e) states, in pertinent part: "The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." The supplemental affidavit, on one hand, is simply a beefed-up version of the affidavit previously filed and responds directly to issues raised by plaintiffs regarding the validity of the original Cox affidavit. It is helpful to the court and is consistent with the letter and spirit of Fed. R. Civ. P. 1. Plaintiffs' motion to strike this portion of the supplemental Cox affidavit and the portions of defendant's reply relying thereon is DENIED. See Lighton v. Univ. of Utah, 209 F.3d 1213, 1227 (10th Cir. 2000) (stating that a district court "clearly has discretion to permit supplemental affidavits it finds useful for summary judgment determination" and affirming a district court's denial of a motion to strike because the district court found the supplemental affidavit "contained information relevant and admissible as evidence").

On the other hand, the supplemental affidavit contains new information about the death benefit defendant would have considered Dr. Vakas eligible for if it had perceived the policy as a "paid-up life non-forfeiture option" policy. This information is conjecture by Cox and is not helpful to the court. Therefore, plaintiffs' motion

-8-

to strike the portions of the supplemental affidavit asserting new facts regarding defendant's purported accounting methods for dealing with loans on paid-up policies, and the portions of defendant's reply relying thereon, is GRANTED.  The court will not consider these facts in its analysis of the cross motions for summary judgment.

## III.  MOTION FOR SUMMARY JUDGMENT

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.[5] Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677,

---

[5] Even though the parties have filed cross-motions for summary judgment, the legal standard does not change.  See United Wats, Inc. v. Cincinnati Ins. Co., 971 F. Supp. 1375, 1382 (D. Kan. 1997).  It remains this court's sole objective to discern whether there are any

684 (10th Cir. 1991).

**IV.   ANALYSIS**

A.   APPROVAL BY THE KANSAS COMMISSIONER OF INSURANCE

In plaintiffs' motion for summary judgment, they assert that defendant failed to obtain required approvals of its documents by the Kansas Commissioner of Insurance, rendering the unapproved forms unenforceable.  Defendant argues it was not required to submit any of the documents concerning the insurance policy at issue because the policy was signed in South Coffeyville, Oklahoma and contained express language that it was issued in Oklahoma and governed by Oklahoma law. Defendant further asserts Kansas law recognizes that a contract is governed by the law of the state in which it was entered into and that in cases involving insurance policies, the contract is made where the policy is delivered.

Kansas statutes require insurance companies to make certain filings with the Kansas Commissioner of Insurance.  See K.S.A. § 40-216.  Regarding these filings, the following facts are uncontroverted. The Kansas Commissioner of Insurance approved for use in Kansas the life insurance policy form at issue in this case.  The policy between Dr. Vakas and defendant additionally contained the following printed stamp on its face: "This policy is issued as an Oklahoma contract and its terms, including those concerning the receiving of information by the Agent, shall be construed in accordance with the laws of the state of Oklahoma."  The life insurance policy form approved for use in

---

disputes of material fact, see Harrison W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir. 1981), and the court will treat each motion separately.  See Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

Kansas did not include the stamped language.  The policy loan document was also not approved.  The Kansas Commissioner of Insurance does not consider the "Policy Loan Agreement" nor "Policy Loan Statement" forms that are required by Kansas statutes to be filed with its office because it does not consider them part of the "insurance contract" that Kansas statutes require be filed.

In plaintiffs' reply they refute defendant's allegations that the policy was issued in Oklahoma, but they also state:

> Whether the policy was approved by the Kansas Insurance Commissioner may no longer be material to the court's determination.  Plaintiffs' argued [sic] that the Policy Loan Agreement and the Policy Loan Statement were not part of the insurance contract because they were not approved by the Commissioner and to the extent these documents changed the terms of the policy they are not enforceable.  Defendant contends these documents were not approved by the Commissioner and didn't need such approval.  Plaintiffs agree that these documents do not require the Commissioner's approval as they are not part of the policy.

Plaintiffs therefore appear to be abandoning any argument concerning defendant's compliance with the Kansas Commissioner of Insurance.  Because plaintiffs are no longer arguing this point, the court will no longer consider it.

B.   EFFECT OF NATAL v. TRANSAMERICA ON PLAINTIFFS' CLAIM

On July 28, 1997, a resolution in the case of Natal v. Transamerica, No. 694289 (San Diego Super. Ct. Jul. 28, 1997) was reached.  Natal was a nationwide class action wherein class members asserted that defendant, in connection with the sale of whole life and universal life insurance policies, "misled[] policyholders to believe that only a single or fixed, limited number of out-of-pocket premium

-11-

payments would be required to keep a policy in force, and that the promised death benefits and increasing stable cash values would continue to exist, without the policyholder making any further out-of-pocket payments" and "misled[] policy owners to believe that interest rates, policy changes or monthly deductions illustrated at the time the policies were sold were reasonable, that such rates were not likely to change, or would not change in an amount sufficient to cause the policies to perform differently than was represented at the time of sale."   The class was defined as all persons "who had as of February 24, 1997, . . . an ownership interest in one or more . . . universal life insurance policies . . . issued from January 1, 1981 through June 30, 1996."   Class members were notified of the proposed settlement by individual mailings and newspaper publication.   Class members had until May 27, 1997 to opt out of the class.   Class members who did not opt out of the class were "permanently barred and enjoined from" asserting all claims relating to the "Released Transactions." If plaintiffs' claims are covered under the settlement, it would, of course, be barred by the settlement's terms.   The issue then, is whether plaintiffs' claims are covered by the release in the <u>Natal</u> class action settlement.

Dr. Vakas was mailed a "Notice of Class Action" by defendant on April 7, 1997, which was not returned by the U.S. Postal Service.   On February 13, 1998, Dr. Vakas was mailed a "Notice of Approval of Settlement" by defendant which also was not returned by the U.S. Postal Service.   Dr. Vakas did not elect any benefits under the settlement and did not claim the automatic relief to which he was

-12-

entitled.[6]

Plaintiffs' arguments do not focus on whether Dr. Vakas was or was not a member of the class in Natal.  Rather, plaintiffs assert they are seeking a claim "based on insurance contract law" and that Natal allows plaintiffs to pursue contractual claims.  The Natal settlement states:

> Nothing in this Release shall be deemed to alter a Class Member's rights (except to the extent that such rights are altered or affected by the election and award of benefits under this Settlement Agreement) to make a claim for benefits that will become payable in the future pursuant to the express written terms of the policy form issued by the Defendants.

The "Notice of Approval of Settlement" sent to class members also states: "Regardless of whether you elect relief or not, your contractual rights under the express terms of your existing policy will not be altered.  You will still be able to make a claim for any benefits that may become payable in the future under the express terms of your existing policy."

Defendant concedes that Dr. Vakas' "contractual rights were not altered by the Judgment in Natal."  Defendant broadly states however, that "all class members, John Vakas included, released any claims against Transamerica arising from this policy."  As the Natal settlement states, however, the "Released Transactions" are defined much more narrowly:

---

[6]   Plaintiffs claim the facts put forth in this paragraph are controverted because they are supported by defendant with the affidavit of John Cox.  Because the court finds the affidavit to be fully compliant with Federal Rule of Civil Procedure 56(e), and because this is the only basis for plaintiffs dispute with defendant's facts, the court deems these facts uncontroverted.

> The term "Released Transactions" means the
> marketing, solicitation, application,
> underwriting, acceptance, sale, purchase,
> operation, retention, administration, or
> replacement (by means of surrender, partial
> surrender, loans respecting, withdrawal and/or
> termination of any life insurance policy) of (a)
> the Policies or (b) any insurance policy or
> annuity sold in connection with, or relating in
> any way directly or indirectly to the sale or
> solicitation of, the Policies. Such term shall
> include, without limitation, the matters
> described in Section B.1(i) through B.1(iv)
> [listing specific actions class members are
> enjoined from pursuing with regard to the
> Released Transactions].

Thus, the very terms of the settlement are confined to releasing claims based on the "marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, retention, administration, or replacement" of the covered policies. Plaintiffs are claiming a breach by defendant of the express terms of the insurance policy and are in no way making a claim based on the way the policy was sold or marketed to Dr. Vakas. The court does not consider plaintiffs to have brought a claim for anything other than their alleged entitlement to benefits under the express terms of Dr. Vakas' life insurance policy.

C. THE LIFE INSURANCE POLICY

The court applies Oklahoma law to its analysis of the life insurance policy. "A federal court sitting in diversity . . . must apply the substantive law of the forum state, including its choice of law rules." Vitkus v. Beatrice Co., 127 F.3d 936, 941 (10th Cir. 1997). Kansas is the forum state and Kansas choice of law rules in contract-based actions "permit parties to choose the law applicable to their agreement." Brenner v. Oppenheimer, 273 Kan. 525, 538, 44

-14-

P.3d 364, 374 (2002).  Therefore, a contracted choice of law provision controls all questions of law flowing from the parties' contract and any breach thereof.  Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  The insurance policy states: "This policy is issued as an Oklahoma contract and its terms, including those concerning the receiving of information by the Agent, shall be construed in accordance with the laws of the state of Oklahoma."  The parties to the insurance policy clearly chose Oklahoma law to govern any dispute arising out of that policy and the court will honor that choice.

The well-settled principles of contract law apply when construing the terms of an insurance policy.  See Karlson v. City of Oklahoma, 711 P.2d 72, 74 (Okla. 1985).  The interpretation of an insurance policy is a question of law for the courts.  Wynn v. Avemco Ins. Co., 963 P.2d 572, 575 (Okla. 1998).  An insurance policy is construed to give effect to the intention of the parties.  Karlson, 711 P.2d at 75. When an insurance policy is ambiguous, the terms are construed by looking "to the objectively reasonable expectations of the insured." American Economy Ins. Co. v. Bogdahn, 89 P.3d 1051, 1054 (Okla. 2004). A contract is ambiguous if its terms are "susceptible to more than one interpretation, and reasonably intelligent persons would differ as to their meaning."  Sisk v. Gaines, __ P.3d __, No. 102,268, 2006 WL 2808160, at *3 (Okla. Civ. App. Aug. 29, 2006).  If an insurance contract is found as a matter of law to be ambiguous, or if an exclusion within the policy is found to be masked by technical or obscure language or hidden in the policy's provisions, Oklahoma courts apply the "doctrine of reasonable expectations."  Am. Economy Ins. Co,

89 P.3d at 1054.  Under this doctrine, when construing such language, the meaning is found to be "not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean."  <u>Id.</u>  Thus, Oklahoma courts look to "the objectively reasonable expectations of the insured" when construing ambiguous terms in an insurance policy.  <u>Id.</u>

When a contract's terms are unambiguous, the plain language of the contract controls.  <u>Frank v. Allstate Ins. Co.</u>, 727 P.2d 577, 579-80 (Okla. 1986).  The contract should not be viewed by its isolated clauses, but should be viewed as a whole and each clause should "assist[] in interpretation of the others."  <u>Id.</u> at 585; <u>National Home Life Assur. Co. v. Patterson</u>, 746 P.2d 696, 697 (Okla. Civ. App. 1987)("All provisions of a contract should be given effect."); <u>Sisk</u>, 2006 WL 2808160 at *3 ("Courts generally look to the four corners of an insurance contract and consider it in its entirety in determining the rights and liabilities arising thereunder, without narrowly focusing on some clause or language taken out of context.").  Courts should not strain to find an ambiguity when common sense demonstrates there is none.  <u>Wynn</u>, 963 P.2d at 575.  "The rule that policies are to be construed against the insurer has no application where the provisions are susceptible of only one reasonable construction."  <u>Wynn</u>, 963 P.2d at 575; <u>but see</u> <u>Karlson</u>, 711 P.2d at 74 (stating that when the construction of an insurance contract is "in doubt," the contract should be construed more strongly against the insurer and in favor of the insured).

In this case, the terms of the insurance policy are unambiguous. The policy clearly states on its first page: "Adjustable Life

Insurance Flexible Premiums Payable During Life of Insured to Age 100."  The "Policy Summary" states:

> This policy provides life insurance payable to the beneficiary in the event of the Insured's death prior to age 100.  The amount and frequency of premium payments may be varied and premiums are payable as long as the Insured is living.  At age 100, the net cash value will be paid to the Owner.

The policy then affirms that "we will accept any amount submitted to us as a premium while this policy is in force."  The policy goes on to state: "Between premium payments, this policy is automatically continued as extended insurance under the Non-Forfeiture Options . . . subject to the Grace Period provision."

The Non-Forfeiture provision states:

> The policy may be continued or surrendered under one of the following options:
>
> > Option 1.  Continuation of Insurance (Extended Insurance) - This policy may be continued at the same face amount and with any additional benefits provided by rider, subject to the Grace Period provision and as explained in the Monthly Deduction section.
> >
> > Option 2.  Full Surrender - This policy may be surrendered for its cash surrender value. . . .
> >
> > Option 3.  Paid-Up Life - Subject to the conditions of this option, this policy may be exchanged for a single premium paid-up whole life policy.
> >
> > > The following conditions will apply:
> > >
> > > (a) The policy must be in force on the requested date.
> > >
> > > (b) The owner must make written request for the paid-up policy.
> > >
> > > (c) All rights under this policy will be surrendered in exchange for the

-17-

> paid-up policy.
>
> (d) The amount of paid up insurance is calculated by . . . .
>
> (e) The paid-up policy will be issued and dated as of the date of surrender of this policy.
>
> (f) The premiums used for the single premium paid-up insurance will be those in effect as of the date of surrender of this policy.
>
> If no option is selected, Option 1 - Continuation of Insurance - will apply automatically as described above.

The Grace Period provision states:

> When the gross value is less than the monthly deduction due (as described in the Guaranteed Values section), we will notify the Owner. A premium providing enough gross value to cover the balance of the deduction must be received within a grace period of 31 days from the date of notice. If this premium is not received within the grace period, this policy will lapse.

The Guaranteed Values section states:

> The cash value as described in this section may be borrowed, used to provide Paid-up Insurance, applied under Continuation of Insurance, or taken in cash as a partial or full surrender of this policy.
> . . .
> The gross value on any date is the sum of all net premiums less any refund, plus all accrued interest, less the sum of all accrued monthly deductions and a pro rata portion of the monthly deduction to that date, less any partial surrenders.

The loans Dr. Vakas made against his policy were governed by the following pertinent provisions under the title "Policy Loans":

> We will make a loan subject to the following conditions:
> . . .
> 2. Interest on the loan at the loan interest rate must be paid annually in advance. Interest not

-18-

> paid when due will be added to the loan and will
> bear interest at the same rate.
>
> 3. The loan must be secured by satisfactory
> assignment of the policy.  The loan constitutes
> a first lien on the policy in our favor.
>
> 4. The loan will be secured by that portion of
> the gross value equal to the amount of any loan.

When these provisions are read together, it is clear that the policy is not ambiguous as a matter of law.  The plain terms of the policy show that Dr. Vakas' life insurance policy was not a paid-up policy and that his policy lapsed.  The policy Dr. Vakas purchased expressly stated it was an "adjustable life insurance flexible premium" policy.  Dr. Vakas would have had to affirmatively change his policy to a paid-up policy in order for Option 1 under the Non-Forfeiture provision to not automatically continue in effect.  The uncontroverted evidence shows that Dr. Vakas did not make this affirmative choice.  Plaintiffs have not alleged any affirmative action by Dr. Vakas to change the policy and certainly have not alleged that he complied with the clear procedure under the terms of the policy that require the owner to "make written request for the paid-up policy."  Therefore, the default provision, as provided for in the policy, was a non-forfeiture provision under option 1.  Under option 1, the gross value of the policy was subject to being diminished by monthly charges.

The policy loans taken by Dr. Vakas were secured by the gross value of the policy for the total loan amount he borrowed.  Because interest accrued on the loans, and because Dr. Vakas did not pay the interest, the interest was also added to the balance of the amount secured by the gross value, which was also permitted by the policy's

-19-

terms.  Because the gross value was also being reduced by the monthly "cost of insurance" charges, authorized by the "Monthly Deduction" provision, and because the amount of gross value needed to secure the loan balance kept increasing, there eventually was not enough gross value to cover the cost of insurance.  Under the "Grace Period" provision, the policy therefore lapsed.  It is true that the policy does not provide for an explicit reduction in gross value because of unpaid loan values, but this was not being attempted by defendant.  The gross value of the policy was not being used to pay the loan; the loan balance was ever increasing and because of that, more and more gross value was needed to secure the loan.  This left less available gross value to pay the monthly cost of insurance charges.  Once the gross value was equal to the amount needed to be secured, the policy lapsed, as allowed by the Grace Period provision.

Plaintiffs' contentions to the contrary are easily disposed of.  First, plaintiffs contend that the policy is a "paid up" policy by pointing to the policy data sheet which states "No Charge" under a column titled "Annual Premium."  Plaintiffs fail to note however, that this area of the form is referring to additional benefits that could be provided by a rider, not the insurance policy itself.  On the same policy data sheet, the policy says "Planned Periodic Premiums: $0.00 Annual" but also says immediately below this: "Note: Coverage may expire prior to the insured's age 100 if no premiums are paid after the initial premium or if subsequent premiums are insufficient to continue coverage to such age."  Thus, it is clear from a reading of the entire policy that the parties contracted for an adjustable, flexible premium policy and not a paid-up policy.

-20-

Second, plaintiffs assert there is no language in the policy showing that the gross value will be depleted if the loans are not repaid. Plaintiffs point to the language in the policy stating the "death benefit is subject to policy provisions which may have an effect on the policy benefit payable, for example, Loans, Surrenders and Misstatement of Age or Sex." Plaintiffs assert this provision shows that the terms of the policy allow only the death benefit to be reduced by outstanding loans. Therefore, they assert defendant reduced the gross value of the loan without authority under the policy. Plaintiffs' argument is embedded in their misunderstanding of the procedure authorized by the policy. As discussed above, the gross value was not reduced by the outstanding loan balance. Rather, more of it was needed to secure the outstanding loan balance.

Third, plaintiffs point out that the policy, under a section titled "Loan Repayment" states: "Subject to the non-forfeiture provision, failure to repay the loan will not terminate this policy." This provision states nothing more than what actually happened in Dr. Vakas' scenario. Dr. Vakas did not repay the loan and his policy was not terminated because of his failure. As discussed above, more of the policy's gross value was encumbered, which ultimately caused the policy to lapse under an alternate provision, a fully authorized procedure.

Fourth, plaintiffs point repeatedly to the statement under the title "Payment of Death Benefits" that "loans will be deducted from the death benefit in any settlement under this policy." It is clear upon a whole reading of the contract, however, that this statement refers only to the situation when a loan remains outstanding at the

-21-

time a death benefit becomes payable.  The death benefit will of course be reduced by the amount of outstanding policy loans by the insured, but this has nothing to do with the scenario of Dr. Vakas in which the gross value of the policy itself was surpassed by the value of unpaid loans.

Finally, two arguments are put forth by plaintiffs, both without much vigor.  Plaintiffs note that on the application there is one number written in one row of the section titled "T Plans-Non Participating."  In this row the number "$58,000" is written in the space titled "Lump Sum."  Plaintiffs believe this makes it clear that Dr. Vakas intended to pursue a paid-up policy.  As plaintiffs must realize, however, the application to be considered for life insurance is not a contract.  The plain terms of the contract control - the contract is the clearest intention of the parties, not the application.  Further, this errant number is not placed in its logical or necessary section of the application, and has never been alleged by any party as the amount Dr. Vakas contemplated paying as his initial premium or actually paid.  Plaintiffs have not even attempted to define a "T Plan-Non Participating" policy or how it would have been applied based on Dr. Vakas' contracted policy.  Plaintiffs also point to illustrations given to Dr. Vakas of various premium amounts paid and corresponding schedules of death benefits as evidence that the parties intended a paid-up policy.  Illustrations, however, by their very terms are not a part of the policy contract.  The illustrations specifically state: "This is an illustration not a contract, and is valid only if accompanied by ASL 714."

Even if the policy was ambiguous, however, and the court

-22-

construed the terms against the insurer, plaintiff has offered no evidence showing how they are affirmatively entitled to a benefit under the insurance policy.[7] An ambiguous contract would require the court to look to the "reasonable expectations of the insured" but plaintiffs have offered no facts showing how Dr. Vakas' expectations were any different than those offered by defendant.  It would surely be unreasonable for an insured to expect his life insurance policy to remain in force when he made no additional premium payments and took out loans for near the amount of premium actually paid, yet did not pay a single loan or interest payment, and then, after receiving a letter from the policy informing him that because of all these things, the policy had lapsed, he did nothing.

Plaintiffs carry the burden of persuading the trier of fact that the contract has been breached by defendant.  Defendant has pointed to a wealth of information that it has not breached its agreement with Dr. Vakas by failing to provide benefits under the policy to plaintiffs.  Plaintiffs have not rebutted with any disputed material facts reasonably showing they could successfully carry their burden of demonstrating a breach under the policy in the event of a trial. Put simply, there are no disputed material facts requiring a trial. Plaintiffs' motion for summary judgment is therefore DENIED and defendant's motion for summary judgment is GRANTED.

## V.  CONCLUSION

Plaintiffs' motion to strike is DENIED in part and GRANTED in

---

[7]   Plaintiffs do not seem to be arguing that the policy is ambiguous.  They are simply arguing that their interpretation of the policy is the correct, unambiguous one.

-23-

part.   Plaintiffs' motion for summary judgment is DENIED and defendant's motion for summary judgment is GRANTED.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.


IT IS SO ORDERED.

Dated this   9th   day of November 2006, at Wichita, Kansas.


S/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

-24-